IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:26-cv:01322

| | |
|---|---|
| MICHAEL SHANE APPLE,<br><br>Plaintiff,<br><br>v.<br><br>SHERIFF TERRY S. JOHNSON, in his official and individual capacities;<br><br>CHIEF DEPUTY SHERIFF JACKIE FORTNER, in his individual capacity; and<br><br>TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, as Surety on the Official Bond of Sheriff Terry S. Johnson,<br><br>Defendants. | **COMPLAINT** |

**NOW COMES** the Plaintiff, Michael Shane Apple, by and through his undersigned counsel, Sean P. O'Donnell of Kreider Law, P.L.L.C., and hereby alleges and states as follows:

## JURISDICTION

1. The Plaintiff is a citizen and resident of Alamance County, North Carolina.

2. Defendant Terry S. Johnson is the duly elected Sheriff of Alamance County and was, at all relevant times, Plaintiff's employer. He is sued in his official capacity and in his individual capacity. Plaintiff's claims against Sheriff Johnson in his official capacity are claims against the Office of Sheriff of Alamance County.

3. References in this Complaint to the "Alamance County Sheriff's Office" or the "ACSO" refer to the Office of Sheriff of Alamance County, acting through Sheriff Johnson in his official capacity and the deputies and employees acting under his authority.

4. Defendant Jackie Fortner is, and at all relevant times was, the Chief Deputy Sheriff of Alamance County. He is sued in his individual capacity.

5. This Court has federal-question subject matter jurisdiction over Plaintiff's FMLA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2).

6. This Court also has federal-question subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 for violation of his rights under the First Amendment to the United States Constitution, as incorporated against the States by the Fourteenth Amendment, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

7. This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same case or controversy as Plaintiff's federal claims and form part of the same nucleus of operative fact.

8. This Court therefore has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a).

## VENUE

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Alamance County, North Carolina, which lies within the Middle District of North Carolina, Greensboro Division, pursuant to 28 U.S.C. § 113(a). The parties are properly before this

Court. This Court has jurisdiction over the parties and the subject matter herein.

## SHERIFF'S OFFICIAL BOND AND LIABILITY INSURANCE

10. Defendant Travelers Casualty and Surety Company of America (the "Surety") is, upon information and belief, a corporation authorized to transact surety business in the State of North Carolina, and is the surety on the official bond of Defendant Sheriff Terry S. Johnson, Bond No. 107701094 (the "Sheriff's Bond"), furnished pursuant to N.C. Gen. Stat. § 162-8, with the State of North Carolina as obligee. Ex. A, *Travelers Surety Bond*, at 3, 5. The Sheriff's Bond is recorded in the Office of the Register of Deeds of Alamance County at Book 4400, Pages 832–835, and a certified copy is included in Exhibit A. *Id.* at 1, 7. The Surety is named as a Defendant pursuant to N.C. Gen. Stat. § 58-76-5.

11. Records produced by Alamance County in response to Plaintiff's public records request reflect that the Sheriff's Bond, in the penal sum of $25,000.00, was renewed and in effect for at least the following terms: (a) December 4, 2023 through December 4, 2024; (b) December

4, 2024 through December 4, 2025; and (c) December 4, 2025 through December 4, 2026. Ex. A, *Travelers Surety Bond*, at 9–11.

12. The acts and omissions alleged herein — including the retaliation that followed Plaintiff's 2025 reports of illegal conduct; Plaintiff's retaliatory demotion, return to probation, and transfer in 2025; the mishandling of Plaintiff's first FMLA request in November 2025; the opening of a pretextual administrative investigation; and Plaintiff's termination on or about February 2, 2026 — occurred during the terms of the Sheriff's Bond identified above and were committed by Sheriff Johnson and by deputies and employees acting under his authority and in the course of their official duties.

13. Pursuant to N.C. Gen. Stat. § 58-76-5, every person injured by the neglect, misconduct, or misbehavior in office of a sheriff may institute suit against the sheriff and the surety on his official bond. Sheriff Johnson's governmental immunity as to Plaintiff's state-law claims against him in his official capacity is waived to the extent of the Sheriff's Bond. *See Smith v. Phillips*, 117 N.C. App. 378, 384, 451 S.E.2d 309, 314 (1994).

14. Records produced by Alamance County further reflect that, at all times relevant to this action, Alamance County maintained a public entity liability insurance policy issued by The Travelers Indemnity Company, identified as the insuring company on the declarations of each Primary Policy, under Policy Nos. ZLP-81M61299-23-PB (July 1, 2023 to July 1, 2024), ZLP-81M61299-24-PB (July 1, 2024 to July 1, 2025), ZLP-81M61299-25-PB (July 1, 2025 to July 1, 2026), and ZLP-81M61299-26-PB (July 1, 2026 to July 1, 2027) (collectively, the "Primary Policies"). Ex. B, *Travelers Insurance Policies (Excerpts)*, at 2, 11–12, 21–22, 31–32.

15. By endorsement, the Primary Policies in effect from July 1, 2023 through the present designate the Alamance County Sheriff's Office as a Named Insured under the Public Entity Employment-Related Practices Liability Coverage Part. *Id.* at 3, 13, 23, 33.

16. The Public Entity Employment-Related Practices Liability Coverage Part of each Primary Policy provides limits of $1,000,000 for each wrongful employment practice offense and $1,000,000 in the aggregate, on a claims-made basis, with a retroactive date of July 1, 1985. *Id.* at 4, 14, 24, 34.

17. Records produced by Alamance County further reflect that, at all relevant times, Alamance County maintained an Excess Follow-Form and Umbrella Liability Insurance Policy issued by Travelers Property Casualty Company of America, identified as the insuring company on the declarations of each Umbrella Policy, under Policy Nos. ZUP-15T48295-23-PB, ZUP-15T48295-24-PB, ZUP-15T48295-25-PB, and ZUP-15T48295-26-PB, for the same annual policy periods as the Primary Policies (collectively, the "Umbrella Policies"). Each Umbrella Policy provides limits of $10,000,000 per occurrence and $10,000,000 in the aggregate, lists the Alamance County Sheriff's Office as a Named Insured, and schedules the employment practices liability coverage of the Primary Policies as underlying insurance. By endorsement, the excess follow-form coverage (Coverage A) of each Umbrella Policy applies to damages to which the Primary Policies' employment practices liability coverage would apply but for the exhaustion of its limits of insurance. *Id.* at 5–10, 15–20, 25–30, 35–40.

18. Plaintiff's claims were first made against Defendants by written demand dated August 25, 2026, and arise from wrongful employment

practice offenses committed after the retroactive date of the employment practices liability coverage of the Primary Policies. Ex. C, *Demand Letter*, at 1. Upon information and belief, each of Plaintiff's claims is within the employment practices liability coverage afforded by the Primary Policies and the excess coverage afforded by the Umbrella Policies, and is made against all such policies.

19. To the extent of the coverage afforded by the Primary Policies and the Umbrella Policies, Defendants have waived any governmental immunity to Plaintiff's state-law claims pursuant to N.C. Gen. Stat. § 153A-435. Any policy provision purporting to preserve governmental immunity has no bearing on Plaintiff's FMLA claims, to which state-law governmental immunity is no defense, or on the independent waiver effected by the Sheriff's Bond under N.C. Gen. Stat. § 58-76-5, and governmental immunity does not shield Defendants Johnson and Fortner from liability in their individual capacities for all claims.

## FACTS

20. The allegations contained in the preceding paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

**A. Plaintiff's Employment and Reports of Illegal Conduct**

21. Plaintiff was employed by the ACSO for at least twelve years, until his termination on or about February 2, 2026.

22. Throughout his tenure, Plaintiff received multiple awards recognizing his service to the community.

23. Throughout 2025, Plaintiff reported to multiple ACSO leaders that wholesale cheating on mandatory annual in-service training and testing requirements was occurring throughout the agency.

24. Plaintiff reported that the cheating included:

    a. that every Lieutenant on patrol was cheating on required in-service examinations;

    b. that answers to in-service examinations were posted publicly for deputies to facilitate cheating; and

    c. cheating was endorsed by multiple Lieutenants, including Plaintiff's own supervisor, Lieutenant Jason Teague.

25. Plaintiff reported this cheating to at least the following individuals within the ACSO, including members of his chain of command:

a. Captain Chad Martin;

b. Captain Craig Stephens;

c. Lieutenant Justin Vaughn;

d. Lieutenant Benjamin White;

e. Sergeant Krystal Neil;

f. Sergeant Joey Holmes;

g. Corporal Kyle Peeks; and

h. Other individuals to be proven at trial.

26. The reported cheating violated, among other authorities, N.C. Gen. Stat. Chapter 17E and the rules of the North Carolina Sheriffs' Education and Training Standards Commission at 12 NCAC 10B, N.C. Gen. Stat. § 14-230 (willful failure of a public officer to discharge duties of office), and implicated the constitutional disclosure obligations recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), because, upon information and belief, ACSO deputies who cheated on their in-service certification examinations subsequently testified in criminal

proceedings as though they were properly qualified and certified officers, misrepresenting their qualifications to courts of law and compromising the prosecutions in which they testified.

27. Plaintiff also reported to leadership, including Captains Martin and Stephens, that Lieutenant Ben White had accessed confidential investigatory information, including information regarding active criminal cases and materials subject to grand jury secrecy, and used that information, together with video footage from investigatory files, to create "reels" circulated among ACSO administration for entertainment purposes, implicating the secrecy of grand jury proceedings protected by N.C. Gen. Stat. § 15A-623.

## B. Plaintiff's Retaliatory 2025 Demotion and Transfer

28. Plaintiff's reports of cheating were repeated and persistent.

29. Lieutenant Justin Vaughn encouraged deputies in the ACSO Special Operations Unit to cheat on in-service examinations during briefings to the entire unit, including indicating that answers to the in-service testing examinations were posted on a board within the unit's workspace.

30. On or about January 6, 2025, after Lieutenant Justin Vaughn encouraged deputies to cheat on in-service examinations, Plaintiff told Lieutenant Vaughn directly not to do so and reported Lieutenant Vaughn's conduct to leadership.

31. Plaintiff is in possession of video in which Lieutenant Vaughn, while briefing the Special Operations Unit, and in the presence of Lieutenant Teague, directs members of the unit to utilize the answers that are posted on a board within the unit's workspace to cheat on in-service examinations.

32. Plaintiff also instructed the deputies under his supervision not to cheat on their in-service examinations.

33. Lieutenant Teague, Plaintiff's direct Supervisor, had himself shown Plaintiff how in-service examination answers were being obtained, printed, and shared among ACSO personnel.

34. Lieutenant Teague repeatedly encouraged members of the ACSO Special Operations Unit to engage in cheating on in-service examinations.

35. In or around August 2025, Plaintiff obtained and retained documentary evidence of the cheating, including printed screenshots

of in-service examination results displaying the correct answers that were being circulated among ACSO personnel.

36. Shortly thereafter, on or about August 28, 2025, and while Plaintiff was continuing to report the cheating within his chain of command, the ACSO disciplined Plaintiff on the asserted grounds that he had reported late, left early, and failed to accurately record his time.

37. Upon information and belief, the timecard allegation against Plaintiff was initiated by, or at the instigation of, Lieutenant Teague, the same supervisor who had endorsed the cheating that Plaintiff reported.

38. At the time of the timecard allegation, Plaintiff had only recently completed a prior period of disciplinary probation.

39. The ACSO used the timecard allegation to return Plaintiff to probation, which, under the ACSO's Rules of Conduct and Disciplinary Procedures, rendered Plaintiff ineligible for promotional consideration and exposed him to enhanced discipline for any subsequent allegation, however minor.

40. As part of that discipline, the ACSO demoted Plaintiff from the rank of Sergeant to Deputy, with a corresponding reduction in his annual pay of $7,563.60.

41. In a memorandum to Chief Deputy Fortner dated August 28, 2025, and copied to Sheriff Johnson, Major David Sykes sustained a charge of "Unsatisfactory Performance" against Plaintiff based on the timecard allegations and directed that Plaintiff be demoted to Deputy III, placed on twelve months' probation, removed from the Special Response Team and K-9 unit, and transferred to the Street Crimes unit to report to Lieutenant Vaughn, the same supervisor whose cheating Plaintiff had reported and who is captured on video directing deputies to cheat on in-service examinations. Ex. D, *Major Sykes Memorandum of August 28, 2025*, at 1–2.

42. The ACSO's personnel records reflecting the demotion were thereafter released to and published by *The Alamance News* on April 30, 2026.

43. The timecard and attendance allegations were pretextual. Plaintiff did not knowingly misreport his time, and the allegations were not the true reason for the discipline imposed on him.

44. Upon information and belief, other ACSO employees whose time records reflected comparable or greater irregularities were not demoted or placed on probation.

45. The ACSO's own Grievance Procedures policy recognizes "[d]iscrimination against any employee for reporting improper or illegal activities" as a grievable matter, and its written anti-harassment and anti-retaliation policy provides that "[n]o transfer, demotion, termination, or other disadvantage will be imposed on any employee in retaliation for any of their actions."

46. Defendants demoted, disciplined, and transferred Plaintiff because he reported, and had obtained documentary proof of, wholesale cheating on in-service certification examinations and the misuse of confidential investigatory information by ACSO leadership.

47. The demotion, probation, and transfer were intended to discredit Plaintiff, to suppress his reports, and to deter Plaintiff and other deputies from reporting misconduct.

48. By characterizing Plaintiff's alleged misconduct as a "timecard violation," an accusation of dishonesty in the recording of his work time, Defendants sought to impugn Plaintiff's integrity and to

undermine his credibility as a witness to the very misconduct he had reported.

49. The 2025 demotion, return to probation, and transfer were the first steps in a continuing course of retaliation against Plaintiff that culminated in his termination on February 2, 2026, approximately five months after his demotion.

**C. Plaintiff's First FMLA Request**

50. On October 27, 2025, Plaintiff visited his primary care provider, Dr. Sean S. Harper.

51. Dr. Harper completed a Certification of Health Care Provider for Plaintiff's FMLA request certifying that Plaintiff suffered from "chronic anxiety that has acutely worsened," that he had been referred to a therapist and would attend weekly therapy sessions beginning October 28, 2025, and that he would be incapacitated for a continuous period from October 27, 2025 through January 26, 2026. Ex. E, *First FMLA Request and Substantiating Paperwork*, at 2–4.

52. On or about November 2, 2025, Plaintiff submitted this FMLA request, together with Dr. Harper's completed paperwork, to Joann Taylor of the ACSO Human Resources Department. *Id.*

53. No one within ACSO Human Resources, Plaintiff's chain of command, or ACSO management acknowledged, designated, or otherwise responded to this request.

54. Plaintiff continued working because he feared retaliation for taking leave.

55. More than two weeks later, at approximately 6:29 p.m. on November 18, 2025, Ms. Taylor called Plaintiff and told him his leave had been approved but that there was a problem because he had continued working and being paid after Dr. Harper signed the FMLA paperwork. Ex. F, *Screenshot of Phone Call*, at 2.

56. Ms. Taylor encouraged Plaintiff to "wash" the request and act as though it had never been submitted, and remarked that she was retiring on December 9, 2025, and that "this is what happens when they won't fill positions for HR."

57. Because of the ACSO's encouragement to "wash" the request, Plaintiff continued working despite his valid FMLA request and his physician's recommendation that he take medical leave.

58. Ms. Taylor subsequently retired, and the ACSO never processed Plaintiff's first FMLA request, in violation of the FMLA, 29 U.S.C. §

2615, and its implementing regulations at 29 C.F.R. Part 825, Subpart C, including the eligibility, rights-and-responsibilities, and designation notices required by 29 C.F.R. § 825.300.

**D. Plaintiff's Second FMLA Request and Approved Leave**

59. On December 28, 2025, Plaintiff injured his leg in an off-duty accident requiring surgery and significant rehabilitation.

60. Plaintiff sought medical attention and informed his supervisor of the injury.

61. Following multiple medical appointments, Plaintiff submitted completed FMLA paperwork to Human Resources Representative Lana Speller.

62. The ACSO processed this request and granted FMLA leave commencing January 14, 2026. Ex. G, *Second FMLA Request and Substantiating Paperwork*, at 2–3; Ex. J, *Investigation Record*, at 1.

**E. The Investigation and Plaintiff's Termination While on FMLA Leave**

63. In December 2025, an anonymous Gmail account sent all of the Alamance County Commissioners an old photograph of Plaintiff,

which Commissioner Steve Carter forwarded to Sheriff Johnson. Ex. H, *Captain Martin Memorandum of December 30, 2025*, at 1.

64. Captain Chad Martin investigated and, in a memorandum to Sheriff Johnson dated December 30, 2025, found that the photograph was old, that it had been sent by an anonymous individual with a history of conflict with Plaintiff, and that the anonymous individual was "clearly attempting to get him fired." *Id.* Captain Martin recommended only a verbal reprimand. *Id.* at 1–2.

65. About one month later, the ACSO relied on another anonymous email to the County Commissioners, described below, as the basis for terminating Plaintiff.

66. On February 2, 2026, the ACSO opened, investigated, and resolved a disciplinary charge against Plaintiff and terminated his employment, all within approximately two hours.

67. The ACSO complaint form for the matter, Complaint No. 26-02001, records that Captain Randy Denham documented a complaint against Plaintiff at 8:00 a.m. on February 2, 2026, naming Sheriff Johnson as the complainant. Ex. I, *ACSO Complaint Form*, at 1.

68. At approximately 9:00 a.m. that morning, Sheriff Johnson forwarded to Captain Denham an anonymous email that had been sent to the Sheriff and the County Commissioners on January 29, 2026, from the account "alamancetruthfinder@gmail.com." The email reproduced a Facebook post that Plaintiff made on January 25, 2026, while he was on approved FMLA leave. Ex. J, *Investigation Record*, at 1; Ex. K, *Sheriff's Email of February 2, 2026*.

69. The record further reflects that, before contacting Plaintiff, Major Sykes "contacted County Attorney Rik Stevens to inquire about the proper procedure for addressing Deputy Apple while he was out on FMLA." Ex. J, *Investigation Record*, at 1. Defendants therefore knew that Plaintiff was on FMLA leave when they investigated and terminated him.

70. Captain Denham then telephoned Plaintiff, with Major Sykes present, read him the post, asked whether he had posted it, and ended the interview as soon as Plaintiff answered. Ex. J, *Investigation Record*, at 2.

71. Plaintiff was given no opportunity to explain the post, respond to the charge, or offer mitigating information.

72. On or about February 2, 2026, while Plaintiff was on approved FMLA leave, Chief Deputy Fortner called Plaintiff at approximately 9:59 a.m. and terminated his employment for allegedly engaging in "Unbecoming Conduct" in violation of ACSO Policy #II-I(6). Ex. L, *Termination Letter*.

73. When Plaintiff attempted to mention that he was on FMLA leave, Chief Deputy Fortner hung up on him.

74. The conduct underlying that charge was a social-media post concerning an individual at a public park. Ex. J, *Investigation Record*, at 1–2.

75. Captain Denham's written findings sustaining the charge are dated February 3, 2026, the day after Plaintiff had already been terminated. Ex. J, *Investigation Record*, at 1.

76. Under the ACSO's Rules of Conduct, Unbecoming Conduct is a Category A offense punishable by discipline ranging from a three-day suspension without pay to demotion or termination. Ex. J, *Investigation Record*, at 3.

77. Defendants imposed the most severe sanction available, within hours, on the strength of an anonymous complaint about an off-duty

post, only weeks after Captain Martin had recommended a verbal reprimand in response to a similar anonymous complaint that he found was "clearly attempting to get him fired." Ex. H, *Captain Martin Memorandum of December 30, 2025*, at 1.

78. ACSO's rationale for Plaintiff's termination is pretextual because:

    a. the ACSO opened, investigated, and resolved the charge, and terminated Plaintiff, within approximately two hours on February 2, 2026, after a one-question telephone interview, and memorialized its findings only the following day;

    b. other ACSO employees made comparable or more inflammatory social-media posts without discipline; and

    c. the termination followed closely on the heels of Plaintiff's protected reports of illegal conduct and his exercise of FMLA rights.

79. The temporal proximity between Plaintiff's protected activity, both his reports of illegal conduct and his FMLA leave, and his termination, together with the procedural irregularities surrounding the investigation, Plaintiff's inability to respond to the allegations against him, and the disparate treatment of similarly situated

employees, establish that Defendants' stated reasons for terminating Plaintiff are pretextual.

**F. Disparate Treatment of Similarly Situated Employees**

80. Multiple ACSO employees have routinely made social-media posts in violation of Department policy, including posts made while in uniform identifying themselves as ACSO personnel, and posts containing inflammatory content, without, upon information and belief, any resulting discipline.

81. ACSO employees have also accessed confidential information from active investigatory case files to create "reels" circulated throughout the Department, content that is inflammatory to the public and implicates the secrecy provisions governing grand jury materials under North Carolina law.

82. Chief Deputy Fortner personally appears in at least one of the photographs attached hereto as Exhibit M, publicly posted to the Facebook account of his son, Sam Fortner, showing Chief Deputy Fortner in the presence of a Confederate flag prominently displayed at his son's residence. Ex. M, *Fortner Confederate Flag Pictures*, at 1–2. The ACSO's investigation record charged that Plaintiff's

comparatively innocuous post violated the ACSO social-media policy prohibiting "[a]ny material on the internet that brings discredit to or may adversely affect the efficiency or integrity of the ACSO." Ex. J, *Investigation Record*, at 3. Chief Deputy Fortner's own public association with a Confederate flag undermines the credibility of the ACSO's reliance on that policy to terminate Plaintiff.

83. Upon information and belief, an individual identified by ACSO personnel as "Randy Denham" was publicly inducted into the Sons of Confederate Veterans, Col. Charles F. Fisher Camp 813, as reflected in the post attached hereto as Exhibit N, without any resulting inquiry or discipline, in contrast to the swift discipline imposed on Plaintiff. Ex. N, *Denham SCV Post*.

84. Cpl. Kyle Peeks, one of the individuals to whom Plaintiff reported the in-service examination cheating described above, has repeatedly posted personal photographs to social media while wearing his ACSO uniform and displaying ACSO insignia, as reflected in the posts attached hereto as Exhibits O, O-1 and O-2, without, upon information and belief, any resulting discipline, further

demonstrating the ACSO's selective and pretextual application of its social-media policy against Plaintiff. Exs. O, O-1 and O-2, *Peeks Posts*.

85. Upon information and belief, the individuals below are current or former ACSO employees who posted content to social media in violation of ACSO policy without receiving any discipline, further reflecting the ACSO's selective and pretextual enforcement of its social-media policy against Plaintiff:

a. an employee identified on Facebook as "Shane Adams," Exhibit P, *Shane Adams Post*;

b. an employee identified on Facebook as "B-Dub Blankenship," who posted content containing profanity and a sticker depicting a public figure found civilly liable for wrongful death with a caption expressing approval of that figure, Exhibits Q, R, S, T, U, and V, *B-Dub Posts*;

c. an employee identified on Facebook as "Johnny Thunder," who posted content containing profanity directed at a political viewpoint (Exhibit W, *J. Thunder Post*);

d. other current or former ACSO employees to be identified in discovery.

86. This disparate treatment demonstrates that the stated reason for Plaintiff's termination was a pretext for unlawful retaliation.

**G. Damages**

87. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages, overtime, and benefits (including health insurance, retirement contributions, and accrued leave); loss of future earning capacity and impairment of his certification status under 12 NCAC 10B; severe emotional distress, anxiety, humiliation, and damage to his professional reputation; and other damages to be proven at trial.

## FIRST CAUSE OF ACTION
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
## (Against Defendant Johnson in His Official and Individual Capacities)

88. The allegations contained in the preceding paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

89. North Carolina recognizes a tort cause of action for the discharge of an at-will employee in violation of the public policy of the State. *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175–76, 381 S.E.2d 445, 447 (1989).

90. At all relevant times, Sheriff Johnson was Plaintiff's employer and possessed the exclusive right to hire, discharge, and supervise the employees of the ACSO pursuant to N.C. Gen. Stat. § 153A-103.

91. Sheriff Johnson concurred in each disciplinary action taken against Plaintiff, including his termination, as the ACSO's Rules of Conduct and Disciplinary Procedures require.

92. Deputies of a North Carolina Sheriff are at-will employees whom the Sheriff has the exclusive right to hire and discharge. N.C. Gen. Stat. § 153A-103(1); *Randleman v. Johnson*, 162 F. Supp. 3d 482, 487 (M.D.N.C. 2016). The *Coman* public-policy exception therefore applies to Plaintiff's discharge.

93. The public policy of North Carolina is expressed in, among other authorities to be proven at trial, N.C. Gen. Stat. Chapter 17E and 12 NCAC 10B (governing certification of Sheriff's office personnel); N.C. Gen. Stat. § 14-230 (prohibiting willful failure of public officers to discharge their duties); the statutes requiring truthful sworn testimony by law enforcement officers identified below; the constitutional disclosure obligations recognized in *Brady v. Maryland* and *Giglio v. United States*; North Carolina's statutory counterparts

to those obligations, N.C. Gen. Stat. §§ 15A-903 and 17E-16; Article I, Sections 19 and 23 of the North Carolina Constitution; and Article I, Section 14 of the North Carolina Constitution, which protects the freedom of speech.

94. The Sheriffs' Education and Training Standards Commission requires that each in-service training topic be accompanied by a written test, which the officer must pass by achieving 70 percent correct answers, 12 NCAC 10B .2005.

95. The Sheriffs' Education and Training Standards Commission authorizes the revocation, denial, or suspension of the certification of any justice officer who has knowingly and designedly, by any means of false pretense, deception, fraud, misrepresentation, or cheating, obtained or attempted to obtain credit, training, or certification, 12 NCAC 10B .0204(c)(2), or who has knowingly made a material misrepresentation of any information required for certification, 12 NCAC 10B .0204(c)(1).

96. North Carolina law requires every law enforcement officer to take an oath to "faithfully and impartially execute the duties of my office as a law enforcement officer." N.C. Gen. Stat. § 11-11.

97. North Carolina law requires every witness, including a law enforcement officer, to swear or affirm that he will testify truthfully, N.C. Gen. Stat. § 8C-1, Rule 603, and makes willfully false testimony under oath a felony, N.C. Gen. Stat. § 14-209. Procuring another person to commit perjury is a separate felony. N.C. Gen. Stat. § 14-210.

98. Specialized permits and certifications held by law enforcement officers are, in many instances, a legal prerequisite to the admissibility of the results they obtain and the testimony they give. *See, e.g.*, N.C. Gen. Stat. § 20-139.1(b)(2) (chemical analysis permit); N.C. Gen. Stat. § 8-50.2(b)(1) (speed-measuring instrument operator certificate). An officer who testifies that he is certified, or whose testimony depends on his certification, therefore makes a material representation to the court.

99. It is therefore the public policy of North Carolina that law enforcement officers testify truthfully about their qualifications and certification, and that the certification on which their testimony depends be honestly earned.

100. An officer who testifies as a qualified and certified officer after cheating on his certification examinations misrepresents his qualifications to the court, and supervisors who encourage that cheating facilitate that misrepresentation.

101. North Carolina has codified its own counterparts to the disclosure obligations recognized in *Brady* and *Giglio*, which reach impeachment evidence as well as exculpatory evidence. *See State v. Williams*, 362 N.C. 628, 636, 669 S.E.2d 290, 296 (2008). The State's open-file discovery statute requires every law enforcement agency to make available to the prosecutor, on a timely basis, a complete copy of its files related to the investigation of the crimes charged, and makes it a Class H felony for any person willfully to omit or misrepresent evidence or information that must be provided to the prosecutor. N.C. Gen. Stat. § 15A-903(a)(1), (c), (d).

102. North Carolina further requires every justice officer certified by the Sheriffs' Education and Training Standards Commission who has been notified that he may not be called to testify at trial based on bias, interest, or lack of credibility to report that notification to the Justice Officers' Standards Division and to his agency head, and requires the

agency head to report it to the Division as well. N.C. Gen. Stat. § 17E-16(a)–(b). The officer's agency head, here Sheriff Johnson, is among the officials authorized to issue such a notification. *Id.* § 17E-16(a)(1).

103. These statutes, together with the due process guarantee of Article I, Section 19 and the rights of the accused guaranteed by Article I, Section 23 of the North Carolina Constitution, express the public policy of North Carolina that information bearing on the credibility of law enforcement witnesses be preserved, reported, and disclosed to prosecutors, courts, and the Commission, not concealed.

104. Evidence that ACSO officers obtained their mandatory in-service certifications by cheating, and that their supervisors directed the cheating, is such information.

105. By reporting the cheating and refusing to participate in it, Plaintiff acted in furtherance of this public policy.

106. Defendants' retaliation against Plaintiff for that conduct, culminating in his discharge, contravened this public policy.

107. Plaintiff did not merely report the cheating; he refused to participate in it or to facilitate it. He did not use the posted answers to complete his own in-service examinations, he told Lieutenant

Vaughn directly not to encourage deputies to cheat, and he instructed the deputies under his supervision not to cheat.

108. The discharge of an employee for refusing to engage in conduct that violates the law contravenes the public policy of North Carolina. *Coman*, 325 N.C. at 175–76, 381 S.E.2d at 447.

109. Reporting and cooperating in the exposure of illegal conduct within a sheriff's office furthers the public policy of North Carolina and supports a claim for wrongful discharge against the sheriff. *See Phillips v. Gray*, 163 N.C. App. 52, 56–58, 592 S.E.2d 229, 232–33 (2004) (sustaining wrongful-discharge claim by former deputy against sheriff in his individual capacity).

110. Plaintiff's retaliatory demotion in August 2025 evidences the retaliatory motive for his discharge.

111. Defendants used the allegation of Plaintiff committing timecard violations as a pretextual excuse to retaliate against Plaintiff for reporting the repeated cheating, misuse of grand jury information, and other violations of law taking place within ACSO.

112. Plaintiff was terminated for reporting violations of the very statutes and constitutional provisions identified above, in direct contravention of the public policy of North Carolina.

113. In discharging Plaintiff, Sheriff Johnson acted with malice, in bad faith, and outside the scope of his lawful authority: he intentionally did what a person of reasonable intelligence would know to be contrary to his duty, intending it to be prejudicial and injurious to Plaintiff. *See Wilcox v. City of Asheville*, 222 N.C. App. 285, 730 S.E.2d 226 (2012). Sheriff Johnson is therefore not entitled to public official immunity.

114. As a direct and proximate result of Sheriff Johnson's wrongful discharge of Plaintiff in violation of public policy, Plaintiff has suffered compensatory damages in an amount to be proven at trial, recoverable against Sheriff Johnson in his official capacity to the extent governmental immunity has been waived and against Sheriff Johnson in his individual capacity, and is entitled to punitive damages against Sheriff Johnson in his individual capacity under N.C. Gen. Stat. § 1D-15 based on his malicious, fraudulent, and/or willful and wanton conduct.

## <u>SECOND CAUSE OF ACTION</u>
## INTERFERENCE WITH RIGHTS UNDER THE FMLA FOR THE FIRST FMLA REQUEST
## (Against Defendant Johnson in His Official Capacity)

115. The allegations contained in the preceding paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

116. To establish interference with rights under the Family and Medical Leave Act, Plaintiff must show that (1) he was entitled to an FMLA benefit; (2) the ACSO interfered with the provision of that benefit; and (3) that interference caused harm. 29 U.S.C. § 2615(a)(1); *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015). None of these elements requires proof of the employer's intent or motive, and each is satisfied as alleged above.

117. The ACSO is a "public agency" within the meaning of 29 C.F.R. § 825.108 and is therefore a covered "employer" under the FMLA without regard to any minimum-employee threshold.

118. Plaintiff was an "eligible employee" under the FMLA, having been employed by the ACSO for at least twelve months and for at least 1,250 hours of service during the relevant twelve-month period.

119. Plaintiff suffered from a chronic anxiety condition related to post-traumatic stress that had acutely worsened, constituting a serious health condition under the FMLA.

120. Plaintiff submitted a valid request for FMLA leave on or about November 2, 2025 because of that condition. Ex. E, *First FMLA Request and Substantiating Paperwork*, at 1–4.

121. The ACSO failed to acknowledge, designate, or otherwise respond to this request and failed to provide the eligibility notice, rights-and-responsibilities notice, and designation notice required by 29 C.F.R. § 825.300.

122. An employer's failure to follow the FMLA's notice requirements may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights. 29 C.F.R. § 825.300(e).

123. The ACSO affirmatively encouraged Plaintiff to disregard his own valid request and "wash" the existence of the request as if it had never happened.

124. Discouraging an employee from using FMLA leave constitutes interference with the employee's FMLA rights. 29 C.F.R. § 825.220(b).

125. The ACSO's interference prejudiced Plaintiff. Had the ACSO provided the required notices and honored his request, Plaintiff would have taken protected leave beginning on or about October 27, 2025, the first day of the continuous period of incapacity certified by Dr. Harper, Ex. E, *First FMLA Request and Substantiating Paperwork*, at 3. Plaintiff would have obtained treatment for his condition, including therapy.

126. Instead, Plaintiff was deprived of the ability to take and structure protected leave around his treatment and continued working against his physician's recommendation, aggravating his condition. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002); *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296 (4th Cir. 2016).

127. As a direct and proximate result of the ACSO's interference with Plaintiff's FMLA rights, Plaintiff has suffered damages, and is entitled to liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii), together with such equitable relief as may be appropriate under 29 U.S.C. § 2617(a)(1)(B), and reasonable attorneys' fees and costs.

**<u>THIRD CAUSE OF ACTION</u>**
**INTERFERENCE AND RETALIATION IN VIOLATION OF THE FMLA FOR THE SECOND FMLA REQUEST**
**(Against Defendant Johnson in His Official Capacity)**

128. The allegations contained in the preceding paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

129. Plaintiff engaged in protected activity under the FMLA by requesting and taking approved FMLA leave commencing January 14, 2026.

130. The FMLA's prohibition against interference prohibits an employer from discriminating or retaliating against an employee for having exercised FMLA rights, and an employer may not use the taking of FMLA leave as a negative factor in employment actions, including disciplinary actions. 29 C.F.R. § 825.220(c). This cause of action is brought under both 29 U.S.C. § 2615(a)(1) and 29 U.S.C. § 2615(a)(2).

131. Plaintiff was terminated by Chief Deputy Fortner on or about February 2, 2026, while on approved FMLA leave.

132. Before contacting Plaintiff on February 2, 2026, ACSO command staff consulted the County Attorney about how to address Plaintiff while he was on FMLA leave. Ex. J, *Investigation Record*, at 1. The

ACSO therefore knew that Plaintiff was on protected leave when it terminated him.

133. By terminating Plaintiff during his approved FMLA leave, the ACSO also interfered with his right to be restored to his position, or to an equivalent position, at the conclusion of that leave. 29 U.S.C. §§ 2614(a)(1), 2615(a)(1).

134. The temporal proximity between Plaintiff's FMLA leave and his termination is sufficient to establish the causal-connection element of a prima facie case of retaliation. *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006) (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989)).

135. The ACSO's stated reason for Plaintiff's termination, a social-media post, is pretextual, and he was in fact fired because he had taken medical leave after his injury and had reported the repeated illegal acts of ACSO personnel to his employer.

136. Plaintiff's FMLA leave was a negative factor in, and a but-for cause of, his termination. The ACSO opened, investigated, and resolved the charge against Plaintiff within approximately two hours, without permitting him to respond, while he was on approved FMLA leave

and immediately after its command staff consulted the County Attorney specifically about how to address him "while he was out on FMLA." Ex. J, *Investigation Record*, at 1.

137. The conduct charged, a Facebook post made while Plaintiff was on leave, would not have resulted in termination of an employee who was not on FMLA leave, as reflected by the ACSO's failure to discipline the employees identified above for comparable or more serious social-media posts while not on FMLA leave.

138. As a direct and proximate result of the ACSO's interference and retaliation against Plaintiff for exercising his FMLA rights, Plaintiff has suffered lost wages and benefits, and is entitled to front pay, back pay, liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii), and reasonable attorneys' fees and costs.

## <u>**FOURTH CAUSE OF ACTION**</u>
## **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
## **(Against Defendant Johnson in His Official Capacity, to the Extent of the Sheriff's Bond)**

139. The allegations contained in the preceding paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

140. Sheriff Johnson, acting through ACSO Human Resources, owed Plaintiff a duty to exercise reasonable care in receiving and processing his request for medical leave.

141. To state a claim for negligent infliction of emotional distress, a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and (3) the conduct did in fact cause the plaintiff severe emotional distress. *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).

142. ACSO Human Resources negligently failed to process Plaintiff's first FMLA request and negligently advised Plaintiff to "wash" a valid request supported by his treating physician's certification of a serious condition.

143. Plaintiff's claim is not barred by the exclusivity provision of the Workers' Compensation Act, N.C. Gen. Stat. § 97-10.1, because Plaintiff's emotional injury is not an "injury by accident arising out of and in the course of the employment." N.C. Gen. Stat. § 97-2(6).

144. Plaintiff's injury attributable to negligent infliction of emotional distress did not result from an accident or from any risk to which he was exposed because of the nature of his employment as a deputy sheriff; it resulted from the ACSO's mishandling of his request for medical leave, and the Workers' Compensation Act does not compensate the emotional distress damages Plaintiff seeks.

145. Plaintiff has not filed any workers' compensation claim arising from these events, and this claim is not ancillary to any such claim. *See Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 489–90, 496, 340 S.E.2d 116, 120–21, 124 (1986); *Buser v. S. Food Serv., Inc.*, 73 F. Supp. 2d 556, 568–71 (M.D.N.C. 1999) (holding employee's negligent infliction of emotional distress claim arising from termination during FMLA leave not barred by the Act); *Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 636–37 (M.D.N.C. 2000).

146. It was reasonably foreseeable that negligently failing to process, and advising Plaintiff to abandon, a request for medical leave grounded in a medically certified anxiety condition would cause Plaintiff severe emotional distress and the exacerbation of his condition.

147. As a direct and proximate result of this negligence, Plaintiff continued working against his physician's recommendation and suffered post-traumatic stress and a substantial exacerbation of his medically certified anxiety condition, each a severe and disabling emotional and mental condition of a type generally recognized and diagnosed by professionals trained to do so. Plaintiff is entitled to damages against Sheriff Johnson in his official capacity, and against the Surety, up to the penal sum of the Sheriff's Bond.

## FIFTH CAUSE OF ACTION
## ACTION ON SHERIFF'S OFFICIAL BOND PURSUANT TO N.C. Gen. Stat. §§ 58-76-5 and 162-8
## (Against Defendant Johnson in His Official Capacity and the Surety)

148. The allegations contained in the preceding paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

149. N.C. Gen. Stat. § 162-8 required Sheriff Johnson to furnish a bond conditioned on the faithful performance of the duties of his office. The Surety executed the Sheriff's Bond, Bond No. 107701094, as surety for Sheriff Johnson, as a continuous public official bond for an indefinite term beginning December 4, 2022, in the penal sum of $25,000.00, and renewed it upon payment of a separate annual

premium for each term identified above. Ex. A, *Travelers Surety Bond*, at 3, 9–11.

150. Sheriff Johnson, and Chief Deputy Fortner and other deputies and employees acting under Sheriff Johnson's authority, engaged in neglect, misconduct, and misbehavior in office as alleged herein, including by demoting and terminating Plaintiff in retaliation for reporting illegal conduct in violation of the public policy of North Carolina, failing to process Plaintiff's valid FMLA request and directing him to "wash" it, and negligently inflicting severe emotional distress upon Plaintiff.

151. Plaintiff is a person injured by the neglect, misconduct, and misbehavior in office of Sheriff Johnson and those acting under his authority within the meaning of N.C. Gen. Stat. § 58-76-5.

152. Under N.C. Gen. Stat. § 58-76-5, the Sheriff's Bond does not become void upon the first recovery and may be put in suit from time to time until the whole penalty is recovered, and each instance of neglect, misconduct, and misbehavior in office gives rise to a separate claim against the Sheriff's Bond.

153. As a direct and proximate result of this neglect, misconduct, and misbehavior in office, Plaintiff has suffered the damages described herein, and the Surety is jointly and severally liable with Sheriff Johnson, in his official capacity, for those damages up to the $25,000.00 penal sum of the Sheriff's Bond. Ex. A, *Travelers Surety Bond*, at 3.

154. Plaintiff further contends, as a nonfrivolous argument for extending or modifying existing law, that each annual renewal of the Sheriff's Bond, issued upon payment of a separate premium for a separate term, constitutes a separate undertaking, such that the Surety's liability should be measured by the penal sum for each term during which neglect, misconduct, or misbehavior in office occurred, notwithstanding the bond's provision limiting the Surety's liability to the penal sum regardless of the number of years the bond remains in force or the number of premiums paid. *See* Ex. A, *Travelers Surety Bond*, at 3, 9–11. Plaintiff's injuries arose from neglect, misconduct, and misbehavior in office occurring during at least two such terms: his demotion, return to probation, and transfer in August 2025 and the mishandling of his first FMLA request in November 2025, during

the term ending December 4, 2025; and his termination on February 2, 2026, during the term beginning December 4, 2025.

## <u>SIXTH CAUSE OF ACTION</u>
## RETALIATION IN VIOLATION OF THE FIRST AMENDMENT AND 42 U.S.C. § 1983
## (Against Defendants Johnson and Fortner in Their Individual Capacities and Defendant Johnson in His Official Capacity)

155. The allegations contained in the preceding paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

156. At all relevant times, Defendants Johnson and Fortner acted under color of state law within the meaning of 42 U.S.C. § 1983.

157. The First Amendment to the United States Constitution, as incorporated against the States by the Fourteenth Amendment, prohibits a public employer from taking adverse employment action against an employee in retaliation for the employee's speech as a citizen on a matter of public concern.

158. Plaintiff engaged in speech on matters of public concern when he reported, as alleged above:

a. widespread cheating by ACSO supervisory officers on in-service training and certification examinations mandated by N.C. Gen. Stat. Chapter 17E and 12 NCAC 10B;

b. the likelihood of those officers misrepresenting their qualifications in criminal proceedings, implicating the disclosure obligations recognized in *Brady v. Maryland* and *Giglio v. United States*; and

c. the misuse of confidential investigatory information and materials subject to grand jury secrecy by ACSO leadership.

159. The integrity of law enforcement officers, their compliance with mandatory certification standards, and the reliability of their testimony in criminal prosecutions are matters of paramount public concern. Speech exposing misconduct and corruption within a law enforcement agency lies at the core of First Amendment protection. *See Lane v. Franks*, 573 U.S. 228 (2014); *Durham v. Jones*, 737 F.3d 291 (4th Cir. 2013); *Hunter v. Town of Mocksville*, 897 F.3d 538 (4th Cir. 2018).

160. Plaintiff spoke as a citizen, not pursuant to his official duties. Plaintiff's ordinary job duties as a Sergeant and member of the Strike

Team, SRT, and K-9 team, did not include investigating, auditing, or reporting misconduct by his superior officers, monitoring in-service examination integrity, or policing the use of confidential investigatory information by command staff. Plaintiff's reports exposed misconduct by the very supervisors and command staff to whom he answered.

161. Although ACSO policy charges supervisors with reporting known violations by the employees under their supervision, no ACSO policy or directive assigned Plaintiff responsibility for reporting misconduct by his superior officers or by command staff, and ACSO policy assigns the investigation of serious employee misconduct to the Chief Deputy and the Office of Professional Standards.

162. Plaintiff's interest, and the public's interest, in exposing this misconduct outweighed any interest of the ACSO in the efficient operation of its office.

163. Plaintiff's reports did not disrupt the ACSO's operations; any disruption flowed from the misconduct he exposed, not from his reporting of it.

164. Defendants took adverse employment actions against Plaintiff that would deter a person of ordinary firmness from exercising his First

Amendment rights, including demoting him from Sergeant to Deputy with a reduction in pay and returning him to disciplinary probation in August 2025, transferring him to work under Lieutenant Vaughn, and terminating his employment on February 2, 2026.

165. Plaintiff made his reports to Captains Martin and Stephens, among others, who report to the ACSO's command staff, and, upon information and belief, Plaintiff's reports were communicated to Chief Deputy Fortner and Sheriff Johnson before the adverse actions described above.

166. Command staff, including Chief Deputy Fortner and Sheriff Johnson, frequently met with Captains Martin and Stephens to discuss operations within ACSO and personnel matters.

167. Major Sykes's August 28, 2025 memorandum imposing Plaintiff's demotion was addressed to Chief Deputy Fortner and copied to Sheriff Johnson, and Captain Martin reported to Sheriff Johnson concerning Plaintiff in December 2025. Ex. D, *Major Sykes Memorandum of August 28, 2025*, at 1–2; Ex. H, *Captain Martin Memorandum of December 30, 2025*, at 1.

168. Plaintiff's protected speech was a substantial motivating factor in, and a but-for cause of, each of these adverse actions, as shown by, among other things, Defendants' knowledge of Plaintiff's reports; the close temporal proximity between Plaintiff's reports and the adverse actions; the pretextual nature of the stated reasons for the demotion and termination; the procedural irregularities in the investigation that preceded the termination; and the ACSO's failure to discipline similarly situated employees.

169. ACSO policy requires that the Sheriff be consulted on and concur in all disciplinary actions recommended against an employee.

170. Sheriff Johnson concurred in Plaintiff's 2025 demotion, return to probation, and transfer, and later in his termination.

171. The February 2, 2026, letter terminating Plaintiff's employment bears the signatures of Sheriff Johnson and Chief Deputy Fortner. Ex. L, *Termination Letter*.

172. Chief Deputy Fortner, who is responsible under ACSO policy for evaluating and assigning Category A disciplinary matters, personally terminated Plaintiff by telephone.

173. Major Sykes's August 28, 2025 memorandum imposing Plaintiff's demotion, probation, and transfer was addressed to Chief Deputy Fortner. Ex. D, *Major Sykes Memorandum of August 28, 2025*, at 1.

174. Upon information and belief, Chief Deputy Fortner also directed or approved Plaintiff's 2025 demotion, return to probation, and transfer.

175. Sheriff Johnson is the final policymaker for the ACSO with respect to personnel decisions, including the hiring, discipline, demotion, and discharge of deputies, pursuant to N.C. Gen. Stat. § 153A-103. His decisions to demote, discipline, and terminate Plaintiff therefore constitute the official policy of the ACSO, rendering Defendant Johnson liable in his official capacity.

176. A single decision by an official who possesses final policymaking authority under state law with respect to the action taken may constitute the official policy of the governmental entity. *See Hunter v. Town of Mocksville*, 897 F.3d 538, 554–58 (4th Cir. 2018) (holding that town manager who fired police officers in retaliation for their protected speech acted as the town's final policymaker, rendering the town liable under § 1983); *see also Monell v. Dep't of Soc. Servs.*, 436

U.S. 658 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

177. At all relevant times, it was clearly established that a public employer may not suspend, demote, or discharge a law enforcement officer in retaliation for reporting misconduct and corruption within his agency. See *Durham v. Jones*, 737 F.3d 291, 303–04 (4th Cir. 2013) (holding it clearly established by 2009 that "an employee's speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, . . . is protected"); *Hunter v. Town of Mocksville*, 897 F.3d 538, 545 (4th Cir. 2018).

178. Defendants Johnson and Fortner are therefore not entitled to qualified immunity.

179. Defendants Johnson and Fortner acted maliciously, intentionally, and/or with reckless and callous indifference to Plaintiff's rights, entitling Plaintiff to punitive damages against them in their individual capacities. *See Smith v. Wade*, 461 U.S. 30 (1983).

180. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered lost wages and benefits, loss of rank, loss of future earning capacity, damage to his professional reputation and

certification status, and severe emotional distress, and is entitled to compensatory damages, punitive damages against Defendants Johnson and Fortner in their individual capacities, equitable relief including front pay and the expungement of the retaliatory discipline from his personnel records, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF THE RIGHT TO FREEDOM OF SPEECH UNDER ARTICLE I, SECTION 14 OF THE NORTH CAROLINA CONSTITUTION
## (Against Defendant Johnson in His Official Capacity — Pleaded in the Alternative)

181. The allegations contained in the preceding paragraphs are incorporated by reference and re-alleged as if fully set forth herein.

182. This cause of action is pleaded in the alternative pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

183. Article I, Section 14 of the North Carolina Constitution provides that "[f]reedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained."

184. North Carolina recognizes a direct cause of action under the State Constitution against state actors, in their official capacities, who

violate a citizen's free-speech rights where no adequate state remedy exists. *Corum v. Univ. of N.C.*, 330 N.C. 761, 413 S.E.2d 276 (1992). Governmental immunity does not bar such a claim. *Id.*

185. Plaintiff's reports of cheating on mandatory in-service certification examinations, the likelihood that those officers would misrepresent their qualifications in criminal proceedings, and the misuse of confidential investigatory and grand jury information each constitute speech on matters of public concern protected by Article I, Section 14.

186. Acting through Sheriff Johnson, Chief Deputy Fortner, and other officers acting under the Sheriff's authority, the ACSO retaliated against Plaintiff for that protected speech by demoting him with a reduction in pay and returning him to disciplinary probation in August 2025, transferring him to work under Lieutenant Vaughn, and terminating his employment on February 2, 2026.

187. Plaintiff lacks an adequate state remedy for these violations. To the extent Defendants contend that governmental immunity, any "Preservation of Governmental Immunity" endorsement to the Primary Policies or Umbrella Policies, or the limited penal sum of the Sheriff's Bond bars or limits Plaintiff's common-law claims against

Sheriff Johnson in his official capacity, those claims do not afford Plaintiff an adequate remedy. *See Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 678 S.E.2d 351 (2009); *Randleman v. Johnson*, 162 F. Supp. 3d 482, 489–90 & n.4 (M.D.N.C. 2016) (denying Sheriff Johnson's motion to dismiss state constitutional free-speech claim where he contended, without explanation, that a wrongful-discharge claim and a bond-based waiver of governmental immunity afforded an adequate state remedy).

188. Further, North Carolina common law does not provide a remedy for a retaliatory demotion or other discipline short of discharge.

189. Plaintiff asserts this cause of action principally as to his retaliatory demotion, return to probation, and transfer, for which North Carolina law provides no adequate remedy.

190. Plaintiff asserts this cause of action as to his termination only in the alternative, to the extent the Court determines that Plaintiff lacks an adequate state-law remedy for his discharge.

191. As a direct and proximate result of this violation of Plaintiff's rights under Article I, Section 14 of the North Carolina Constitution, Plaintiff has suffered lost wages and benefits, loss of rank, damage to

his professional reputation, and severe emotional distress, and is entitled to compensatory damages and to equitable relief, including front pay and the expungement of the retaliatory discipline from his personnel records.

## <u>DEMAND FOR JURY TRIAL:</u>

The Plaintiff demands a trial by jury for all issues so triable.

**WHEREFORE,** the Plaintiff respectfully prays unto the Court for the following relief:

1. That the Plaintiff be awarded compensatory damages for lost wages, overtime, and benefits, including health insurance, retirement contributions, and accrued leave, in an amount to be proven at trial, but not less than $1,461,946, together with additional damages to be proven at trial, against Defendants Johnson and Fortner individually, against Defendant Johnson in his official capacity to the full extent of the insurance coverage described above, and against the Surety to the full extent of the Sheriff's Bond;
2. Front pay in lieu of reinstatement to Plaintiff's former position;

3. That the Court enter judgment declaring that Defendants violated Plaintiff's rights under the First Amendment to the United States Constitution and Article I, Section 14 of the North Carolina Constitution, and order Defendants to rescind and expunge Plaintiff's 2025 discipline, probation, and demotion and his 2026 termination from his personnel records and to correct any report of separation filed with the North Carolina Sheriffs' Education and Training Standards Commission;
4. That the Plaintiff be awarded liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii);
5. That the Plaintiff be awarded punitive damages against Defendant Johnson in his individual capacity pursuant to N.C. Gen. Stat. § 1D-15, and against Defendants Johnson and Fortner in their individual capacities pursuant to 42 U.S.C. § 1983;
6. That Plaintiff have and recover judgment against Defendant Johnson, in his official capacity, and the Surety, jointly and severally, on the Sheriff's Bond, up to the $25,000.00 penal sum of the Sheriff's Bond or, in the alternative, up to the penal sum for each annual term of the Sheriff's Bond during which Defendant

Johnson and those acting under his authority engaged in neglect, misconduct, and misbehavior in office;

7. Pre-judgment and post-judgment interest as allowed by law;
8. That the costs of this action, including the Plaintiff's reasonable attorney's fees, be taxed against the Defendants herein pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 2617(a)(3), and all other applicable law; and
9. That the Plaintiff be granted such other and further relief as this Court deems just and proper.

This is the 10th day of November, 2026.

*/s/ Sean P. O'Donnell*
Sean P. O'Donnell
N.C. Bar No: 63665
Kreider Law, P.L.L.C.
1007 N. Elm Street
Greensboro, NC 27401
(336) 510-6193
sean@kreider.law
*Attorney for Plaintiff*